**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| KHIANTI B. THOMAS,<br><br>Plaintiff,<br><br>vs.<br><br>COMMISSIONER OF SOCIAL SECURITY,<br><br>Defendant. | CASE NO. 1:25-CV-02255-BYP<br><br>DISTRICT JUDGE BENITA Y. PEARSON<br><br>MAGISTRATE JUDGE AMANDA M. KNAPP<br><br>**REPORT AND RECOMMENDATION** |

Plaintiff Khianti B. Thomas, seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Commissioner") denying her application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). (ECF Doc. 1.) This Court has jurisdiction pursuant to 42 U.S.C. § 405(g). This matter has been referred to the undersigned Magistrate Judge for a Report and Recommendation pursuant to Local Rule 72.2.

For the reasons set forth below, the undersigned recommends that the final decision of the Commissioner be **AFFIRMED**.

## I. Procedural History

Ms. Thomas filed her DIB and SSI applications on August 10, 2023, alleging a disability onset date of July 8, 2023. (Tr. 71, 85.) She alleged disability due to major depression, torn meniscus of right knee, social and general anxiety, post-traumatic stress disorder ("PTSD"), heart problems, high blood pressure, high heart rate, high cholesterol, type two diabetes, vision problems, neuropathy in both feet, headaches, insomnia with nightmares, constipation, and

memory issues. (*Id.*) Her claims were denied at the initial level (Tr. 69-70) and upon reconsideration (Tr. 110, 122), and she requested a hearing (Tr. 143).

An Administrative Law Judge ("ALJ") held a hearing on October 28, 2024 (Tr. 40-68) and issued an unfavorable decision on December 13, 2024 (Tr. 11-39). Ms. Thomas requested review by the Appeals Council, and her request was denied, making the ALJ's decision the final decision of the Commissioner. (Tr. 1-3.)

Ms. Thomas filed the instant Complaint on October 21, 2025 (ECF Doc. 1), and it is fully briefed (ECF Docs. 8, 10, 12). Ms. Thomas raises the following assignments of error:

> (1) The ALJ's residual functional capacity finding is unsupported by substantial evidence. The ALJ improperly excluded limitations from the prior administrative medical findings despite finding the findings persuasive and failed to provide a legally sufficient reason for excluding the limitations.
>
> (2) The ALJ's residual functional capacity finding is unsupported by substantial evidence. The ALJ failed to indicate the level of persuasiveness given to the prior administrative medical findings and failed to follow the appropriate legal standard for evaluating prior administrative medical findings.
>
> (3) The ALJ failed to evaluate Plaintiff's symptomology pursuant to SSR 16-3p and 20 C.F.R. §§ 404.1529 and 416.929.

(ECF Doc. 8, p. 1.)

## II. Evidence

### A. Personal, Educational, and Vocational Evidence

Ms. Thomas was born in 1977 and was 46 years old on the alleged disability onset date, making her a younger individual under Social Security regulations. (Tr. 71, 85.) She had at least a high school education. (Tr. 273.) She has not worked since July 8, 2023, the alleged onset date. (Tr. 71, 85.)

### B. Medical Evidence

#### 1. Physical Treatment History[1]

On December 18, 2023, Ms. Thomas underwent a consultative examination with James Gatton, M.D. (Tr. 804-12.) She reported right knee pain, a history of anxiety and depression, panic attacks, and not liking to leave her home or be around crowds very often. (Tr. 810.) She denied weakness, numbness, and incoordination. (*Id.*) On examination, she could get on and off the exam table without difficulty; she walked without an assistive device but had a hobbled gait and a limp favoring the right side; she could walk heel toe, walk on heels, and walk on toes; she was unable to hop or squat; she displayed full orientation, fluent speech, and intact cranial nerves and comprehension; range of motion was reduced in the right hip; and motor, strength, sensation, and fine fingering were normal throughout. (Tr. 810-11.)

On March 14, 2024, Ms. Thomas presented to Sarah J. Colon, CNP, at Mansfield Family Health. (Tr. 1072-77.) She reported knee pain and swelling in the back after walking, with shooting pain down the left leg. (Tr. 1072-73.) Her physical examination showed tenderness to the right knee and lumbar back but was otherwise normal. (Tr. 1076.) CNP Colon ordered x-rays of the back and knee. (Tr. 1074.)

Ms. Thomas underwent x-rays of the lumbar spine and right knee on March 29, 2024. (Tr. 857-58, 864-65, 1096, 1098.) The lumbar spine x-ray showed: no acute osseous abnormality of the lumbar spine; mild, multilevel degenerative endplate spondylosis; and mild levoscoliosis. (Tr. 858, 1096.) The right knee x-ray showed: moderate to marked narrowing of the medial joint compartment; sclerosis of the medial tibial plateau; and hypertrophic spurs

[1] The summary of the medical evidence is not exhaustive and is generally limited to evidence cited by the parties that is from the alleged disability period and relevant to the legal and factual issues before the Court.

involving the knee joint and the patellofemoral joint. (Tr. 864-65, 1098.) At a follow-up on April 19, 2024, CNP Colon referred Ms. Thomas to orthopedics based on the x-rays. (Tr. 1062.)

Ms. Thomas returned to see CNP Colon on May 23, 2024. (Tr. 1052-59.) She reported back and knee pain and said she may have missed the calls to schedule with orthopedics. (Tr. 1054.) Her physical examination showed normal range of motion throughout. (Tr. 1055.) At a video appointment on June 27 with CNP Colon, Ms. Thomas requested a cane, saying that she had difficulties with balance and was using a stick from a tree for stability. (Tr. 1047.) She reported back and knee pain and said she had not yet set up an orthopedics appointment per the referral from April. (Tr. 1048.) CNP Colon said she would attempt to get the cane approved through insurance. (Tr. 1047.)

On May 30, 2024, Ms. Thomas sought chiropractic treatment at Brown Chiropractic with James W. Brown, DC. (Tr. 1009.) She reported constant sharp discomfort in the buttocks that increased with movement and decreased with ice. (*Id.*) Her physical examination showed subluxation at T8, sacrum, L3, L1, T6, T2 and C4. (*Id.*) She returned to see DC Brown on June 4 with the same complaints. (Tr. 1010.) Physical examination findings were the same, but DC Brown noted "decreased spasm indicative of improvement of the subluxation findings." (*Id.*)

On August 21, 2024, Ms. Thomas presented to Carter Battista, D.O., at Ohio Health Physicians Group Interventional Pain Management. (Tr. 1319-32.) She reported low back pain that was 8/10 and caused numbness in both legs, that increased with sitting, standing, lifting, forward bending, backward bending, twisting, and walking, and that decreased with medication. (Tr. 1323.) Due to her pain, she said that she did not get dressed, washed with difficulty, could only lift light weights, walked with a stick or crutches, could sit for 30 minutes, could stand for one hour, slept less than two hours a night, had no social or sex life, and could not travel. (Tr.

1321.) Her physical examination showed: decreased range of motion in the lumbar spine on extension and bilateral rotation; lumbar paraspinal tenderness bilaterally; full strength in the lower extremities; and positive axial loading bilaterally. (Tr. 1327.) Dr. Battista reviewed the lumbar spine x-ray from April and diagnosed lumbar radiculopathy, lumbar degenerative disc disease, lumbar spondylosis, and chronic pain syndrome. (Tr. 1319, 1327.) He ordered an MRI of the lumbar spine, referred Ms. Thomas to physical therapy, suggested an epidural injection, and prescribed celecoxib and gabapentin. (Tr. 1319, 1329.)

On August 28, 2024, Ms. Thomas attended an appointment with Deana Kay Fanello, CNP at OhioHealth Orthopedic & Sports Medicine Physicians. (Tr. 1288-304.) She reported chronic bilateral knee pain that improved with rest and increased with activity, getting up from a chair, and weight-bearing. (Tr. 1291.) Treatment with ice and NSAID's had not provided significant relief, but the knee had not given out or felt unstable, and she could fully bend and straighten it. (*Id.*) Her examination noted swelling, tenderness, and normal range of motion in the cervical back. (Tr. 1293.) CNP Fanello reviewed an x-ray of the right knee that showed: moderate to marked narrowing of the medial joint compartment; sclerosis of the medial tibial plateau; and hypertrophic spurs involving the knee joint and the patellofemoral joint. (*Id.*) She administered cortisone injections in both knees, discussed physical therapy and medication options, and referred Ms. Thomas to an orthopedic specialist. (Tr. 1293-95, 1298.)

On September 19, 2024, Ms. Thomas underwent an MRI of the lumbar spine that showed: mild degenerative disc disease at L4-5 and a shallow broad-based left paracentral to left foraminal protrusion resulting in moderate left foraminal narrowing; moderate facet arthropathy on the left side at the L3-4 level with a small facet joint effusion; and no spinal canal stenosis at any level. (Tr. 1315-16 (dup. at 1370-71).)

On October 4, 2024, Ms. Thomas followed up with Lisa Michelle Green, NP at Interventional Pain Management. (Tr. 1333-46.) She reported low back, left leg, and right knee pain that was 5/10, increased with "everything," and decreased with medications. (Tr. 1337.) Her physical examination remained unchanged from the previous pain management appointment. (Tr. 1341.) CNP Green reviewed the September 2024 MRI (Tr. 1343), continued Celebrex and gabapentin (Tr. 1333), prescribed Tizanidine (*id.*), and recommended epidural steroid injections, which Ms. Thomas said she wanted to think about (*id.*).

On October 17, 22, and 24, 2024, Ms. Thomas underwent physical therapy with Casey Hoffman, PT and Jamie Coomer, PTA at Ohio Health Outpatient Rehabilitation. (Tr. 1372-78.) Her initial examination showed: accentuated lordosis; decreased range of motion in the lumbar spine and bilateral hips; 4/5 strength in the bilateral lower extremities; intact sensation; and significantly antalgic gait with decreased stance bilaterally. (Tr. 1372-73.) PT Hoffman recommended therapy twice per week for four weeks (Tr. 1373), but the record reflects that insurance authorized only three visits (Tr. 1377).

**2. Mental Health Treatment History**

On May 8, 2023, few months before the alleged onset date, Ms. Thomas attended an outpatient assessment with Amy Watson, LISW, at Catalyst Life Services. (Tr. 442-60.) She had an open case with Child Protective Services ("CPS"), and she sought mental health and addiction counseling at CPS's suggestion. (Tr. 442.) She reported that she had two minor children (ages 8 and 14) with whom she had a good relationship (Tr. 442), and she had a 40-year-old nephew who was like a best friend (Tr. 443). She was taking Prozac 5mg for depression but said she "may need a little more." (Tr. 447.) She reported a history of child abuse, domestic violence, and molestation (Tr. 451) and drinking alcohol socially, using

marijuana and cocaine monthly, and smoking five to six cigarettes a day (Tr. 448-49). Her reported symptoms included: being too anxious to drive out of town; depressed mood; crying daily; not wanting to leave her room or go to work; anxiety-related stomachaches and confusion; flashback-induced panic attacks two to three times per week; anger outbursts once a month at home and more often at work; inattention and "drifting off when thinking about her trauma"; nightly nightmares and problems sleeping; and substance abuse/addiction. (Tr. 451-52.) On mental status examination, her posture was rigid, her eye contact intense, her attitude toward the examiner anxious and mistrustful, her mood anxious, her speech rapid, her affect full, her thought processes concrete, her ability to make reasonable decisions mildly impaired, her attention/concentration impaired, and her thought content, and insight normal. (Tr. 455-57.) LISW Watson enrolled Ms. Thomas in outpatient mental health treatment. (Tr 458.)

On May 25, 2023, Ms. Thomas presented to Amy Sue Niese, CNP, at Third Street Family Health Services for a medication refill. (Tr. 428-32.) She reported bouts of depression and requested a switch to Wellbutrin because Prozac was not helping. (Tr. 428.) Her mood was dysphoric, she appeared nervous/anxious, and she was alert. (Tr. 428-29.) CNP Niese diagnosed depression, for which she prescribed Wellbutrin, and chronic anxiety, which she noted was stable on Vistaril. (Tr. 431.)

Ms. Thomas saw CNP Niese several more times in 2023 and in January 2024. (Tr. 433-41 (7/14/2023), 819-22 (7/24/2023), 823-26 (9/6/2023), 827-32 (1/23/2024).) Her examinations consistently showed normal mood and behavior or alert mental status (Tr. 435, 820, 824, 828), and she continued to take Vistaril and Wellbutrin for anxiety, insomnia, and depression (Tr. 437, 821, 825-26, 830-31). On January 23, 2024, she reported that her depression felt stable on medication. (Tr. 827.)

On August 10, 2023, Ms. Thomas attended an appointment with Rhonda Lozier, QMHS, at Catalyst Life Services. (Tr. 461-63.) They developed a treatment plan that included individual community psychiatric support and treatment ("CPST") and psychotherapy appointments one to four times per month. (Tr. 462-63.) The record does not contain any individual therapy/counseling notes from Catalyst, but QMHS Lozier provided CPST for Ms. Thomas on November 1, 20, and 27, and December 6 and 12, 2023. (Tr. 1015-26.)

On November 21, 2023, Ms. Thomas underwent a psychological evaluation with consultative examiner James C. Tanley, Ph.D. (Tr. 798-802.) She reported living alone in an assisted living program for people with mental issues but later said her two younger children lived with her. (Tr. 799.) Regarding daily activities, she said her children did most of the chores; she got her daughter on the bus at 7:00 a.m., then went back to bed until her children came home from school. (*Id.*) She had no hobbies or social activities. (*Id.*) Regarding mental health symptoms, she reported feeling anxious and depressed, tapping her feet, having a racing mind, covering the windows, sleeping and eating a lot, and not feeling like doing anything. (*Id.*) On mental status examination, she was generally cooperative; demonstrated no eccentricities of manner, impulsivity, or compulsivity; displayed unremarkable grooming and motor behavior; did not use an assistive device; spoke with adequate velocity, volume, and no notable abnormalities; demonstrated normal, coherent, relevant, and goal oriented thoughts; had poor eye contact but appropriate affect and normal mood; was alert and fully oriented; had largely intact recent and remote memory; interpreted simple proverbs; and was aware of the purpose of the examination and her own mental difficulties. (Tr. 800-01.) Her performance on examination suggested low average range verbal intellectual functioning. (Tr. 800.)

During 2024, Ms. Thomas's primary care provider, CNP Colon, treated her mental health. On February 19, 2024, at a visit to address ear pain, Ms. Thomas's PHQ-9 (depression screening) score was 19. (Tr. 1100.) On March 14, her mood was dysphoric, and she presented as nervous and anxious. (Tr. 1076.) She reported to CNP Colon that she had not been taking her depression medication. (Tr. 1074.) CNP Colon wrote a new prescription for Wellbutrin and instructed Ms. Thomas to take it every day for six weeks to see if it helped. (*Id.*) She also prescribed Vistaril to treat anxiety and insomnia. (Tr. 1075.) On April 19, Ms. Thomas's depression and anxiety screening scores were high, and she reported that depression made it extremely difficult to work, take care of things at home, and get along with other people. (Tr. 1062-63.) On examination, she was alert and attentive, her mood was depressed, and her affect was flat. (Tr. 1063-64.) She wanted to remain on a low dose of Wellbutrin. (Tr. 1062.) On May 23, 2024, she reported some improvement from taking Lamictal as prescribed by her mental health provider. (Tr. 1054-55.)

On April 29, 2024, at QMHS Lozier's referral, Ms. Thomas attended a psychiatric evaluation with Debbie Marshall at Catalyst. (Tr. 1014.)[2] She reported low mood, low energy, and broken sleep, said Vistaril "works ok," and was unsure if Wellbutrin helped her mood. (*Id.*)

On July 26, 2024, Ms. Thomas again attended an appointment with QMHS Lozier at Catalyst to create a treatment plan. (Tr. 1011-13 (dup. at 1027-29).) The plan included CPST and individual psychotherapy two to five times a month. (Tr. 1028-29.) The record does not contain further treatment notes from Catalyst.

On September 6, 2024, Ms. Thomas attended an initial assessment with Valerie Schwartfigure, LPC, at Family Life Counseling and Psychiatric Services. (Tr. 1348-65.) She

[2] This record is labeled page 1 of 12 at the bottom, but pages 2-12 are not evident in the record. (Tr. 1014.)

reported feeling too depressed to participate in meaningful activities and said her only friends were her nephew and one other person. (Tr. 1349.) She reported a history of cocaine use/abuse (Tr. 1350), of domestic violence and physical, sexual, and emotional abuse (Tr. 1354), and of past self-harm and suicidal ideation, but with no current plan, means or intent (Tr. 1353). On mental status examination, her behavior was preoccupied and nervous/anxious; she had visual hallucinations and grandiose delusions; her thought content was obsessional, suspicious, and guarded; her thought process was racing and chaotic; her judgment was mildly impaired; and her appearance, eye contact, body movement speech, mood, affect, perception, memory, insight, orientation, and intellectual functioning were within normal limits. (Tr. 1351-52.) Ms. Thomas reported taking Lamotrigine for bipolar disorder, Vistaril for anxiety, and Wellbutrin. (Tr. 1357.) LPC Schwartfigure recommended individual and/or family counseling one to two times a week for at least four consecutive weeks. (Tr. 1360; *see* Tr. 1363.) She also recommended a psychiatric evaluation. (Tr. 1361.) Ms. Thomas attended individual therapy with LPC Schwartfigure on September 27 and October 11, 2024. (Tr. 1366-69.)

**3. Opinion Evidence**

**i. Treating Source**

On October 11, 2024, LPC Schwartfigure wrote a letter on behalf of Ms. Thomas, stating that: Ms. Thomas was preoccupied with safety and constantly paranoid that people were going to hurt her or her family; "the extensive nature of her mental distress makes it very hard for her to function at all, let alone in public"; she did not leave the house except for medical appointments, which she tried to do by phone; her hypervigilance caused trouble focusing, paying attention, and following directions; and she reported hallucinations and dissociation. (Tr. 1347.) LPC

Schwartfigure asked that these symptoms be taken into consideration in determining Ms. Thomas's eligibility for disability benefits. (*Id.*)

**ii. Consultative Examiners**

**a. James C. Tanley, Ph.D.**

On November 21, 2023, Ms. Thomas underwent a consultative examination with Dr. Tanley. (Tr. 798-802.) Dr. Tanley diagnosed unspecified depressive disorder, moderate severity, unspecified anxiety disorder, and alcohol use disorder, moderate severity. (Tr. 802.) He provided a functional assessment of her mental abilities in the four categories of mental functioning, as follows. (Tr. 802.) As to understanding, remembering, and carrying out instructions, he opined that Ms. Thomas had no difficulties. (*Id.*) As to maintaining attention, concentration, persistence, and pace to perform simple and multistep tasks, he opined that Ms. Thomas was unimpaired during the examination but "were her mood problems, anhedonia, anxiety, and/or alcohol use to worsen, they could negatively impact this domain by interfering with her ability to focus and to concentrate." (*Id.*) As to responding appropriately to supervision and to coworkers in a work setting, he opined that Ms. Thomas "made an unremarkable social presentation," but her mood problems, anhedonia, anxiety and/or alcohol use "could be expected to make the free and easy commerce of social interaction on the job somewhat problematic." (*Id.*) As to responding appropriately to work pressures in a work setting, he noted "there is no reported history of mental or emotional deterioration in response to work exposure," but her mood problems, anhedonia, anxiety, and/or alcohol use "could lower her frustration tolerance and put her at some degree of risk for the pressures of work." (*Id.*)

**b. James Gatton, M.D.**

On December 18, 2023, Ms. Thomas underwent a consultative examination with Dr. Gatton. (Tr. 800-11.) Dr. Gatton opined that Ms. Thomas: "should be able to" walk for one to two hours in an eight-hour workday; "could probably" be on her feet for a combined total of one and a half to two and a half hours in an eight-hour workday; "probably could" carry less than 10 pounds frequently and more than 20 pounds occasionally; and would be limited in her ability to lift, carry, push, pull, crawl, kneel, crouch, climb, stoop, and bend. (Tr. 811.)

**iii. State Agency Medical Consultants**

On January 14, 2024, state agency medical consultant, Steve McKee, M.D., conducted a physical Residual Functional Capacity ("RFC") assessment of Ms. Thomas. (Tr. 80-81, 94-95.) He opined that Ms. Thomas could: occasionally lift/carry 20 pounds and frequently lift/carry 10 pounds; stand/walk for six hours and sit for six hours in an eight-hour workday; never climb ladders, ropes, or scaffolds; frequently stoop, kneel, couch, crawl, and climb ramps and stairs; and should avoid all exposure to hazards, including unprotected heights, hazardous machinery, and commercial driving. (*Id.*) On April 27, 2024, Sai Nimmagadda, M.D., affirmed Dr. McKee's findings on reconsideration. (Tr. 105-06, 117-18.)

**iv. State Agency Psychological Consultants**

On December 8, 2023, state agency psychological consultant, Janet Souder, Psy.D., conducted a Psychiatric Review Technique and opined that Ms. Thomas had: mild limitations in her abilities to understand, remember, or apply information and to concentrate, persist, and maintain pace; and moderate limitations in her abilities to interact with others and to adapt or manage oneself. (Tr. 77-78, 91-92.) Dr. Souder also conducted a mental RFC assessment and opined that Ms. Thomas had the mental RFC to: interact briefly and superficially on an

occasional basis with others; and complete routine tasks with regular expectations and few changes. (Tr. 82, 96.) On April 10, 2024, Ann Lovko, Ph.D., affirmed Dr. Souder's findings on reconsideration. (Tr. 102-03, 106-08, 114-15, 118-20.)

**C. Function Report**

Ms. Thomas completed a Function Report-Adult on October 20, 2023. (Tr. 282-86.) She lived with her two children, who helped her with personal care, and household chores. (Tr. 283.) She went outside "every two days or so," and she could drive and go out alone. (Tr. 284.) She shopped by computer for household needs on Amazon about once a month. (Id.)

Ms. Thomas reported that her knee and back pain and heart issues limited her ability to lift, squat, bend, stand, reach, walk, sit, kneel, and climb stairs. (Tr. 286.) She reported that her anxiety and depression limited her ability to get along with others. (*Id.*) She could walk seven minutes before needing to stop and rest for a few moments. (*Id.*) She tried her best to get along with others, but she had been fired because of problems getting along with other people. (*Id.*)

**D. Hearing Testimony**

At the telephonic hearing on October 28, 2024, Ms. Thomas testified in response to questions from the ALJ and her attorney. (Tr. 47-61.) A Vocational Expert ("VE") also testified. (Tr. 62-66.) The VE testified that a hypothetical individual of Plaintiff's age, education, and work experience, with the functional limitations described in the ALJ's RFC determination, could perform representative positions in the national economy, including address clerk, table worker, and hand bander. (Tr. 63-64.) He also testified that it would preclude competitive employment if the person: needed two additional 15-minute breaks; required a cane for standing and walking; would be off task 15% of the time; or would consistently be absent more than one day per month. (Tr. 64-66.)

## III. Standard for Disability

Under the Social Security Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the existence of a disability. "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

> An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[.]

42 U.S.C. § 423(d)(2)(A).

To make a determination of disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations, summarized as follows:

1. If the claimant is doing substantial gainful activity, he is not disabled.

2. If the claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If the claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, the claimant is presumed disabled without further inquiry.

4. If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if the claimant's impairment prevents him from doing past relevant work. If the claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5. If the claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. § 404.1520[3]; *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987). Under this sequential analysis, the claimant has the burden of proof at Steps One through Four. *See Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at Step Five to establish whether the claimant has the RFC and vocational factors to perform other work available in the national economy. *Id.*

## IV. Law & Analysis

### A. Standard of Review

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record. *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 405 (6th Cir. 2009) ("Our review of the ALJ's decision is limited to whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence.").

When assessing whether there is substantial evidence to support the ALJ's decision, the Court may consider evidence not referenced by the ALJ. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Hum. Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Hum. Servs.*, 889 F.2d 679, 681 (6th Cir. 1989)). The Commissioner's findings "as to any fact if supported by substantial evidence shall

[3] The DIB and SSI regulations cited herein are generally identical. Accordingly, for convenience, in most instances, citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501 et seq. The analogous SSI regulations are found at 20 C.F.R. § 416.901 et seq., corresponding to the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds with 20 C.F.R. § 416.920).

be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). "'The substantial-evidence standard . . . presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts.'" *Blakley*, 581 F.3d at 406 (quoting *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)) (alteration in original). Therefore, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). Even if substantial evidence supports a claimant's position, a court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

Although an ALJ decision may be supported by substantial evidence, the Sixth Circuit has explained that the "'decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007) (citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-47 (6th Cir. 2004))). A decision will also not be upheld where the Commissioner's reasoning does not "build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)).

### A. First Assignment of Error: The ALJ Was Not Required to Adopt All Social Limitations from the State Agency Psychological Consultants' Opinions

In her first assignment of error, Ms. Thomas argues that remand is required because the ALJ found the state agency psychological consultant opinions "supported by the record and consistent with the overall record," then failed to adequately explain why he found them partially persuasive and assessed a mental RFC without a limitation to "brief and superficial interactions."

(ECF Doc. 8, pp. 25- 17; ECF Doc. 12, pp. 5-10.) The Commissioner responds that the ALJ was not required to adopt the state agency psychological consultants' limitations verbatim, and that his mental RFC is supported by substantial evidence. (ECF Doc. 10, pp. 11-14.) In reply, Plaintiff acknowledges that the ALJ was not required to adopt every limitation in the contested opinions (ECF Doc. 12, p. 5), but she maintains that the ALJ was required to explain why his RFC differed from that of the state agency psychological consultants and that he "did not build a logical bridge between the record and the exclusion of the limitations" (*id.* at p. 6).

The psychological consultants opined that Ms. Thomas had moderate limitations in her ability to interact with others and was "able to interact briefly and superficially on an occasional basis with others." (Tr. 82, 107.) The ALJ found the opinions "partially persuasive," explaining:

> Although their conclusions are supported by citation and discussion of specific evidence of record, the undersigned finds these prior administrative medical findings partially persuasive. The consultants utilize non-vocationally defined terminology – such as briefly and superficially – therefore the conclusion is ONLY persuasive to the extent that the consultants opine that the claimant has no more than moderate psychological limitations. This conclusion is supported by, as noted above, the consultants' citation to specific evidence of record. Further, it is consistent with the overall record. For example, it is consistent with, despite multiple diagnosed mental impairments, objective examination findings, including the consultative examination, reflecting no significant abnormality, specifically noting cooperativeness, no impulsivity, coherence, and intact memory (Ex. 6F).

(Tr. 30.) Having explained that he found the opinions "persuasive to the extent that the consultants opine that the claimant has no more than moderate psychological limitations," but that they "utilize[d] non-vocationally defined terminology" (*id.*), the ALJ adopted a social interaction limitation of "interacting occasionally with coworkers, supervisors, and the general public." (Tr. 22.) The ALJ did not incorporate verbatim the state agency consultants' limitation to "interact[ing] briefly and superficially on an occasional basis with others." (Tr. 82.)

Ms. Thomas challenges the ALJ's finding that the opinions were "partially persuasive," arguing that his stated reasons for finding the opinions only partially persuasive, i.e., the use of "non-vocationally defined terminology – such as briefly and superficially," is "inaccurate and inconsistent with legal standards" because some courts found the terms "brief" and "superficial" to be "vocationally relevant." (ECF Doc. 8, p. 15 (citing cases).) Further, because the ALJ's stated reasoning was "factually and legally unsupported," Ms. Thomas argues that the ALJ should have found the state agency psychological opinions fully persuasive and included all of the stated limitations verbatim in the RFC. (*Id.* at pp. 15-17.) The Commissioner responds that the ALJ was not required to adopt the state agency opinions verbatim, particularly given his finding that the opinions were only partially persuasive, and asserts that the RFC limitations adopted by the ALJ were supported by substantial evidence. (ECF Doc. 10, pp. 10-14.)

The Commissioner is correct that the ALJ was "not required to recite the medical opinion of a physician verbatim in his [RFC] finding." *Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 157 (6th Cir. 2009). This is because "[t]he responsibility for determining a claimant's residual functional capacity rests with the ALJ, not a physician." *Id.* (citing 20 C.F.R. §§ 404.1546(c), 416.946(c)). Even where an opinion was given great weight under prior regulations, the Sixth Circuit found "there [was] no requirement that [the] ALJ adopt a state agency psychologist's opinions verbatim; nor [was] the ALJ required to adopt the state agency psychologist's limitations wholesale." *Reeves v. Comm'r of Soc. Sec.*, 618 F. App'x 267, 275 (6th Cir. 2015).

As to Ms. Thomas's assertion that it was inconsistent with legal standards for the ALJ to characterize the words "superficial" and "brief" as "non-vocationally defined terminology," her argument is not consistent with governing authority. As the undersigned has previously explained, "superficial" and "brief" are not defined terms in the Dictionary of Occupational

Titles ("DOT"), the Selected Characteristics of Occupations ("SCO"), or the governing regulations. *See, e.g., Lopez v. Comm'r of Soc. Sec.*, No. 1:22-CV-01801, 2024 WL 1580101, at *19 (N.D. Ohio Apr. 11, 2024) (collecting cases); *Stoodt v. Comm'r of Soc. Sec.*, No. 3:20-CV-02370, 2022 WL 721455, at *16 (N.D. Ohio Jan. 13, 2022), *report and recommendation adopted sub nom. Stoodt v. Comm'r of Soc. Sec.*, No. 3:20-CV-2370, 2022 WL 716105 (N.D. Ohio Mar. 10, 2022). The newer Standard Occupational Classification system ("SOC") also does not define the terms. *See Standard Occupational Classification Manual*, Office of Management and Budget (2018) https://www.bls.gov/soc/2018/soc_2018_manual.pdf, accessed 10/9/2026.[4] In contrast, "[t]he DOT and SCO do have specific defined terms for the frequency of activities or conditions, defining 'occasional' activities and conditions as those existing up to 1/3 of the time." *Stoodt*, 2022 WL 721455, at *17 (citations omitted).

The lack of a defined vocational meaning for the terms "superficial" and "brief" is notable because SSA guidance indicates that VE testimony should be based on a "reliable source of occupational information that is commonly used by vocational professionals and is relevant under [SSA] rules," such as the DOT or SOC. *See* SSR 24-3p, *Use of Occupational Information and Vocational Specialist and Vocational Expert Evidence in Disability Determinations and Decisions*, 89 Fed. Reg. 97158, 97159 (Jan. 6, 2025). Further, ALJs are instructed in their internal manual to direct VEs "not to . . . draw conclusions outside the VE's expertise on vocational issues." HALLEX I-2-6-74(D)(2). Considering the ALJ's obligation to ensure that a VE's testimony is based on reliable sources of occupational information or the VE's own

[4] Standard dictionary definitions also do not clearly specify what work-related interactions qualify as "superficial" or "brief" in a vocational context. *See Lopez*, 2024 WL 1580101, at *19 (quoting *Merriam-Webster's Unabridged Dictionary*, Merriam-Webster, https://unabridged.merriam-webster.com/unabridged/superficial); *Merriam-Webster's Unabridged Dictionary,* Merriam-Webster, https://www.merriam-webster.com/dictionary/brief, accessed 9/23/2026 (defining "brief" as "short in duration, extent or length," "concise," and "curt, abrupt").

expertise on vocational issues, the undersigned cannot agree with Ms. Thomas that it was "inconsistent with the legal standards" or "legally unsupported" for the ALJ to exclude "non-vocationally defined terminology" from the hypothetical given to the VE. (*See* ECF Doc. 8, pp. 15, 17.) The unpublished decisions cited by Ms. Thomas (*id.*) do not change this analysis, as they do not acknowledge or account for the legal or regulatory authority discussed above.

Ms. Thomas's citation to cases finding the terms "superficial" and "occasional" have distinct meanings (*id.* at p. 16) also does not change the analysis. Although the ALJ was not required to adopt all of the limitations from the state agency opinions verbatim, *see Reeves*, 618 F. App'x at 275, to the extent the RFC limitations "conflict[ed] with" the state agency opinions, the ALJ was required to "explain why the opinion was not adopted." SSR 96-8p, *Assessing Residual Functional Capacity in Initial Claims*, 61 Fed. Reg. 34474, 34478 (July 2, 1996).

Here, the ALJ explained that he found the state agency opinions persuasive "ONLY . . . to the extent that the consultants opine[d] that the claimant has no more than moderate psychological limitations" because of the consultants' use of "non-vocationally defined terminology," and further explained that his decision was supported by the records cited by the consultants and consistent with "the overall record" showing "multiple diagnosed mental impairments" but "objective examination findings" that "reflect[ed] no significant abnormality" and "specifically not[ed] cooperativeness, no impulsivity, coherence, and intact memory."[5] (Tr. 30.) Before making this finding, the ALJ discussed Ms. Thomas's treatment records at length, including her diagnoses, subjective complaints, treatment modalities, and mental status findings. (Tr. 27.) Having already detailed the specific findings in Ms. Thomas's treatment records, the

---

[5] Ms. Thomas focuses her arguments on the ALJ's failure to cite specific supporting records in his analysis of the state agency opinions (ECF Doc. 8, p. 17; ECF Doc. 12, pp. 6-7) and does not challenge the accuracy of the ALJ's characterization of the objective examination findings as described here. Any such challenge is deemed waived.

ALJ was not required to "reproduce the list of these treatment records a second time" when he explained why the mental status findings were consistent with the RFC. *See Crum v. Comm'r of Soc. Sec.*, 660 F. App'x 449, 457 (6th Cir. 2016) (citing *Forrest v. Comm'r of Soc. Sec.,* 591 F. App'x 359, 366 (6th Cir. 2014)); *Bledsoe v. Barnhart*, 165 F. App'x 408, 411 (6th Cir. 2006).

Considering the written analysis outlined above, even if this Court assumes there is a "conflict" (as contemplated in SSR 96-8p) between the state agency consultants' limitation to "interact[ing] briefly and superficially on an occasional basis with others" (Tr. 82, 107) and the RCF limiting Ms. Thomas to "interacting occasionally with coworkers, supervisors, and the general public" (Tr. 22),[6] the undersigned finds the ALJ adequately explained his reasons for not adopting the state agency opinions verbatim when he observed that the words "superficial" and "brief" were "non-vocationally defined terminology," adopted the consultant's finding of moderate limitations, and concluded that an RFC limiting Plaintiff to occasional interactions was supported by and consistent with the medical records, including noted mental status findings.

For the reasons set forth above, the undersigned finds the ALJ provided an adequate explanation for his findings regarding the persuasiveness of the state agency psychological consultants' opinions. He was not required to adopt the relevant social interaction limitations verbatim and adequately explained his rationale for not adopting all of the limitations, building an accurate and logical bridge between the evidence and the result. Further, the undersigned finds Plaintiff has failed to demonstrate that the ALJ's stated rationale lacked legal support. Accordingly, the undersigned finds the first assignment of error lacks merit.

---

[6] Notably, the Sixth Circuit considered a situation where state agency psychological consultants found a plaintiff was "able to relate to a few familiar others on a *superficial* basis," and concluded that an RFC limitation to "only *occasional* interaction with the public" was "not inconsistent with either of the state agency psychologists' opinions" and was supported by substantial evidence. *Reeves*, 618 F. App'x at 275 (emphasis added).

## B. Second Assignment of Error: The ALJ Properly Evaluated the State Agency Medical Consultant Opinions

In her second assignment of error, Ms. Thomas argues that the ALJ erred by failing to explicitly state how persuasive he found the state agency medical consultant opinions and by failing to comply with the current regulations governing the evaluation of medical opinion evidence. (ECF Doc. 8, pp. 17-21.) The Commissioner responds that the ALJ appropriately evaluated the state agency medical consultant opinions pursuant to the applicable regulations and that any failure to explicitly state his persuasiveness finding is harmless error. (ECF Doc. 10, pp. 6-11.) In reply, Plaintiff reasserts that the ALJ did not comply with the correct legal standards and did not adequately explain his persuasiveness finding. (ECF Doc. 12, pp. 1-5.)

### 1. Framework for Assessing Medical Opinion Evidence

An ALJ need "not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [a claimant's] medical sources." 20 C.F.R. § 404.1520c(a); *see Sallaz v. Comm'r of Soc. Sec.*, No. 23-3825, 2024 WL 2955645, at *5 (6th Cir. June 12, 2024). But the ALJ must evaluate the "persuasiveness" of any medical opinions using "factors listed in paragraphs (c)(1) through (c)(5)" of the regulation. 20 C.F.R. § 404.1520c. Those five factors include supportability, consistency, relationship with the claimant, specialization, and other factors; but the most important are supportability[7] and consistency.[8] 20 C.F.R. §§ 404.1520c(a), 404.1520c(b)(2), 404.1520c(c)(1)-(5). The ALJ must explain how he considered consistency and supportability but need not explain how he considered the other factors. 20 C.F.R. § 404.1520c(b)(2).

---

[7] "Supportability" is the extent to which a medical source's own objective findings and supporting explanations substantiate or support the findings in his or her opinion. *See* 20 C.F.R. § 404.1520c(c)(1).

[8] "Consistency" is the extent to which a medical source's opinion findings are consistent with the evidence from other medical and nonmedical sources in the record. *See* 20 C.F.R. § 404.1520c(c)(2).

In reviewing an ALJ's medical opinion analysis, courts must consider whether the ALJ: considered the full record in assessing the persuasiveness of the opinion; appropriately articulated his reasons for finding the opinion unpersuasive; and made findings supported by substantial evidence. *See* 20 C.F.R. § 404.1520c (governing how ALJs consider and articulate findings re: medical opinions); 20 C.F.R. § 404.1520(e) (findings re: RFCs will be "based on all the relevant medical and other evidence" in the case record); *see also Blakley*, 581 F.3d at 405.

**2. The ALJ Properly Evaluated the State Agency Medical Consultant Opinions**

State agency medical consultants Drs. McKee and Nimmagadda opined that Ms. Thomas could perform light work with the following additional limitations: never climb ladders, ropes, or scaffolds; frequently stoop, kneel, couch, crawl, and climb ramps and stairs; and avoid all exposure to hazards, including unprotected heights, hazardous machinery, and commercial driving. (Tr. 80-81, 94-95, 105-06, 117-18.) After evaluating these opinions, the ALJ adopted a light physical RFC with the following additional limitations:

> standing and/or walking for 2 hours, sitting for 6 hours; occasional climbing of ramps and stairs, stooping, kneeling, crouching, and crawling; occasional pushing/pulling with the right lower extremity; never climbing ladders, ropes, or scaffolds; and no exposure to unprotected heights, moving mechanical parts, and no commercial driving.

(Tr. 22.) The ALJ explained his consideration of the state agency opinions as follows:

> State agency medical consultants are highly qualified physicians who are experts in the evaluation of the medical issues in disability claims under the Act. They are thus well qualified by reason of training and experience in reviewing an objective record and formulating an opinion as to physical limitations (20 CFR 404.1527(f) and 416.927(f)). These functional limitations were consistent with the objective medical evidence in the record at the initial and reconsideration levels and are supported by the consultants' citation and discussion of that evidence. However, additional medical evidence received while developing the claimant's case for review at the administrative hearing level, as well as evidence in the form of persuasive testimony from the claimant at the hearing, consistent with medical evidence in the record, justifies a conclusion that the claimant's impairments are more limiting than was concluded by the state agency reviewing medical

> consultants (SSR 17-2p). The undersigned agrees, the claimant is limited to a reduced range of light work. However, consistent with the totality of the record at the administrative hearing level, the undersigned finds the claimant's degenerative disc disease and osteoarthritis of the right knee, and continued symptomology despite treatment, in the context of her ubiquitously noted obesity, the undersigned has further reduced the claimant's residual functional capacity to standing and/or walking for 2 hours, with only occasional climbing of ramps and stairs, stooping, kneeling, crouching, and crawling and occasional pushing/pulling with the right lower extremity.

(Tr. 29.)

Ms. Thomas raises three challenges to this analysis. First, she argues the ALJ "failed to indicate the level of persuasiveness" of the opinions, in violation of 20 C.F.R. § 404.1520c(b). (ECF Doc. 8, pp. 17-18.) Second, she argues the ALJ cited inapplicable authority in support of his findings, including SSR 17-2p and outdated versions of the governing regulations. (*Id.* at pp. 18, 20-21.) And third, she argues that the ALJ inadequately explained his consideration of the supportability and consistency of the opinions, providing only "a conclusory application of the factors without articulating evidence in relation to the factors." (*Id.* at pp. 18-20.) The undersigned will address each argument in turn.

Beginning with the first argument, Ms. Thomas is correct that the ALJ was required to "articulate . . . how persuasive [he] f[ound] all of the . . . prior administrative medical findings in [the] case record." 20 C.F.R. § 404.1520c(b). In particular, he was required to "explain how [he] considered the supportability and consistency factors" in assessing the persuasiveness of the state agency opinions. 20 C.F.R. § 404.1520c(b)(2). Looking at the ALJ's written analysis, it is true that he did not use the terms "persuasive" or "persuasiveness" in assessing the state agency opinions. He did, however, provide a detailed discussion of both supportability and consistency. First, he noted the opinions were supported by the medical evidence cited by Drs. McKee and Nimmagadda and consistent with the medical evidence in the record at the time they reviewed the record. (Tr. 29.) Then he explained that both the additional medical evidence received after

the state agency consultants' review and "evidence in the form of persuasive testimony from the claimant at the hearing" supported a finding that Ms. Thomas's physical impairments were more limiting than the state agency opinions found them to be. (*Id.*) Specifically, he found Ms. Thomas's degenerative disc disease and right knee osteoarthritis, which demonstrated "continued symptomology despite treatment," combined with her obesity, warranted further reductions in standing, walking, climbing, postural positions, and use of the right lower extremity. (*Id.*) Thus, while the ALJ did not specifically use the word "persuasive" in his analysis, he discussed supportability and consistency and explained why he adopted RFC limitations that were more restrictive than those set out in the state agency opinions. In this context, the undersigned finds the ALJ adequately complied with his regulatory obligation to discuss "how persuasive" he found the state agency opinions. *See* 20 C.F.R. § 404.1520c(b).

Turning to the second argument, that the ALJ cited inapplicable authority in support of his opinion findings, the Commissioner acknowledges the erroneous citations but argues that they amount to harmless error, because the ALJ clearly applied the correct standards. (ECF Doc. 10, pp. 8-9.) For the following reasons, the undersigned agrees.

First, the ALJ cites SSR 17-2p following his statement that new evidence at the hearing level "justifies a conclusion that the claimant's impairments are more limiting than was concluded by the state agency reviewing medical consultants." (Tr. 29.) The reasons for the citation are unclear, as SSR 17-2p governs the evidence required to make a finding of medical equivalence at Step Three. SSR 17-2p, *Titles II and XVI: Evidence Needed by Adjudicators at the Hearings and Appeals Council Levels of the Administrative Review Process to Make Findings about Medical Equivalence*, 82 FR 15263, 15263 (Mar. 27, 2017). But given that the citation appears wholly irrelevant to the finding it follows, the undersigned also sees no

indication that the ALJ actually applied an incorrect standard from SSR 17-2p to his opinion analysis. Certainly, Ms. Thomas has not identified any reasons for this Court to conclude that a standard from SSR 17-2p was, or may have been, inappropriately applied in the ALJ's opinion analysis. (*See* ECF Doc. 8, pp. 18 (explaining that SSR 17-2p "only applies to medical equivalence to the listings at step three"), 20 (describing the reference to 17-2p as "puzzling").) Because the ALJ's citation to SSR 17-2p appears to be a mere typographical error, the undersigned finds it to be harmless. *See Williams v. Comm'r of Soc. Sec.*, 227 F. App'x 463, 464 (6th Cir. 2007) (upholding a finding of harmless error where a mistaken reference to an inapplicable standard "did not in any way undermine the substance of the analysis or the conclusions reached by the ALJ"); *Draine v. Comm'r of Soc. Sec*., No. 1:22-CV-1370, 2024 WL 1014030, at *24 (N.D. Ohio Mar. 8, 2024) (finding a clear typographical error to be harmless); *see also Ulman v. Comm'r of Soc. Sec.*, 693 F.3d 709, 714 (6th Cir. 2012) (finding harmless error analysis applies in the social security disability context).

Second, the ALJ cited to 20 C.F.R. §§ 404.1527(f) and 416.927(f) in support of a finding that the state agency consultants were "well qualified by reason of training and experience in reviewing an objective record and formulating an opinion as to physical limitations." (Tr. 29.) The Commissioner acknowledges these are the "wrong regulations," which apply to applications filed prior to March 27, 2017, but asserts that the error did not undermine the ALJ's analysis or conclusions because the ALJ previously cited to the correct regulations and had articulated the correct standard for evaluating medical opinion evidence. (ECF Doc. 10, p. 9 (citing Tr. 22, 28).) Consistent with the Commissioner's arguments, the ALJ began his Step Four analysis by explaining that he had "considered the medical opinion(s) and prior administrative medical finding(s) in accordance with the requirements of 20 CFR 404.1520c and 416.920c." (Tr. 22.)

Then, before discussing the state agency medical consultants' opinions, the ALJ described the standard he was applying as follows:

> As for medical opinion(s) and prior administrative medical finding(s), the undersigned cannot defer or give any specific evidentiary weight, including controlling weight, to any prior administrative medical finding(s) or medical opinion(s), including those from medical sources. The undersigned has fully considered the medical opinions and prior administrative medical findings as follows below.

(Tr. 28.) This is consistent with the correct, current standard articulated in 20 C.F.R. §§ 404.1520c and 416.920c. As discussed above, the ALJ then evaluated the supportability and consistency of the opinions, as required under the applicable regulations. (Tr. 29.) Although Ms. Thomas has highlighted the ALJ's citation to now-inapplicable regulations, she has not offered any arguments to support a finding that the ALJ relied, or even may have relied, on defunct elements of the prior regulations in his opinion analysis. (ECF Doc. 8, pp. 18, 21.) Considering the ALJ decision as a whole, the undersigned concludes that the ALJ's citation to inapplicable regulations, in the context of his earlier citations to the correct regulations and a written analysis that is consistent with the correct regulations, also amounted to a harmless typographical error. *See Williams*, 227 F. App'x at 464; *Draine*, 2024 WL 1014030, at *24.

As to Ms. Thomas's third argument—that the ALJ inadequately explained his consideration of supportability and consistency, providing only "a conclusory application of the factors without articulating evidence in relation to the factors" (ECF Doc. 8, p. 18)—the undersigned finds this argument lacks merit. As discussed above, the ALJ acknowledged that the state agency opinions were consistent with the medical records reviewed by Drs. McKee and Nimmagadda and supported by those doctors' own notes but explained that "the totality of the record at the hearing level," including both additional medical records and testimony from Ms. Thomas, warranted and were "consistent with" a further reduction of the physical RFC. (Tr. 29.)

In doing so, he identified specific medical conditions which had "continued symptomology despite treatment" as the basis for the additional limitations. (*Id.*) Further, the ALJ had already provided a detailed discussion of Ms. Thomas's treatment records which outlined her complaints, examination findings, and treatment modalities in connection with the identified conditions. (Tr. 24-27.) The ALJ was not required to "reproduce the list of these treatment records a second time" in his opinion analysis. *See Crum*, 660 F. App'x at 457 (citing *Forrest,* 591 F. App'x at 366); *Bledsoe*, 165 F. App'x at 411. Having considered the ALJ decision as a whole, the undersigned concludes that the ALJ adequately addressed the factors of supportability and consistency in his analysis of the state agency medical consultants' opinions.[9]

For all the reasons set forth above, the undersigned concludes that the ALJ complied with the regulations governing the evaluation of medical opinion evidence in his analysis of the state agency medical opinions, having considered the full record, appropriately articulated how persuasive he found the opinions and why, and made findings supported by substantial evidence. Accordingly, the undersigned finds that the second assignment of error lacks merit.

### C. Third Assignment of Error: The ALJ Properly Evaluated Plaintiff's Subjective Complaints under the Applicable Legal Standards

In her third assignment of error, Plaintiff argues that the ALJ "failed to evaluate [her] symptomology pursuant to SSR 16-3p and 20 C.F.R. §§ 404.1529 and 416.929." (ECF Doc. 8, p. 21.) Specifically, she asserts that the ALJ failed to "articulate . . . specific reasons why her allegations were unsupported" and failed to explain how the medical records, which contained abnormal findings and "other evidence consistent with Plaintiff's allegations," were inconsistent

---

[9] Given that the ALJ adopted a more restrictive RFC than that articulated by the state agency medical consultants, it is also unclear how any alleged error in the ALJ's persuasiveness analysis might have prejudiced Ms. Thomas or deprived her of a substantial right. *See Rabbers*, 582 F.3d at 651 (citations omitted); *see also id*. at 654 ("Generally, . . . we review decisions of administrative agencies for harmless error.").

with her allegations. (*Id.* at pp. 22-25.) The Commissioner responds that the ALJ properly evaluated Plaintiff's subjective symptoms and issued a decision supported by substantial evidence. (ECF Doc. 10, pp. 14-20.)

**1. Legal Standard for Evaluation of Subjective Symptoms**

As a general matter, "an ALJ is not required to accept a claimant's subjective complaints and may properly consider the credibility of a claimant when making a determination of disability." *Jones*, 336 F.3d at 476; *see Alexander v. Kijakazi*, No. 1:20-CV-01549, 2021 WL 4459700, at *13 (N.D. Ohio Sept. 29, 2021) ("An ALJ is not required to accept a claimant's subjective complaints.") (citing *Jones*, 336 F.3d at 476); *see also* 20 C.F.R. § 404.1529(a) and SSR 16-3p, *Evaluation of Symptoms in Disability Claims*, 82 Fed. Reg. 49462, 49463 (Oct. 25, 2017) (explaining that a claimant's statements of symptoms alone are not sufficient to establish the existence of a physical or mental impairment or disability).

Under the two-step process used to assess the limiting effects of a claimant's symptoms, a determination is first made as to whether there is an underlying medically determinable physical or mental impairment that could reasonably be expected to produce the claimant's symptoms. SSR 16-3p, 82 Fed. Reg. 49462, 49463; *Rogers v. Comm'r Soc. Sec.*, 486 F.3d 234, 247 (6th Cir. 2007) (citing 20 C.F.R. § 416.929(a)). If that requirement is met, the second step is to evaluate of the intensity and persistence of the claimant's symptoms to determine the extent to which they limit the claimant's ability to perform work-related activities. SSR 16-3p, 82 Fed. Reg. 49462, 49463; *Rogers*, 486 F.3d at 247. There is no real dispute that the first step is met in this case (Tr. 34), so the discussion will focus on the ALJ's compliance with the second step.

In undertaking this analysis, an ALJ should consider objective medical evidence, a claimant's subjective complaints, information about a claimant's prior work record, and information from medical and non-medical sources. SSR 16-3p, 82 Fed. Reg. at 49464-49466;

20 C.F.R. § 404.1529(c)(3). Factors relevant to a claimant's symptoms include daily activities, types and effectiveness of medications, treatment received to address symptoms, and other factors concerning a claimant's functional limitations and restrictions due to pain or other symptoms. SSR 16-3p, 82 Fed. Reg. at 49465-49466; 20 C.F.R. § 404.1529(c)(3). An ALJ need not discuss all regulatory factors he considers, only those he finds pertinent to the case. SSR 16-3p, 82 Fed. Reg. at 49467.

**2. The ALJ Appropriately Evaluated Plaintiff's Subjective Complaints**

The ALJ found that Ms. Thomas's medically determinable impairments could be expected to cause the alleged symptoms, but also found "the intensity, persistence and limiting effects of these symptoms [were] not entirely consistent with the medical evidence and other evidence of record." (Tr. 23.) In support of this finding, the ALJ considered Ms. Thomas's subjective complaints, including her allegations of: standing and walking limitations of one to two hours with breaks; severe low back and right knee pain that affected her postural abilities and abilities to care for personal hygiene and engage in other activities of daily life; numbness and tingling in the left lower extremity; needing a stick to walk; racing thoughts; panic attacks; visual hallucinations and delusions of grandeur; limited ability to socialize; and difficulty with focus, attention, and following directions. (Tr. 20, 23-27.) The ALJ also considered Ms. Thomas's reported activities, which included: managing her finances; shopping by computer once a month; driving and going out alone; maintaining relationships with her two daughters and a few friends; enjoying painting, sketching, and gardening; caring for personal hygiene with assistance from her daughters; cooking; and caring for her children. (Tr. 20-21.)

Consistent with SSR 16-3p, the ALJ then considered the medical evidence relating to Ms. Thomas's medically determinable impairments, including objective diagnostic and examination findings, treatments prescribed to treat her conditions, and her response to treatment. (Tr. 24-

27.) Regarding Ms. Thomas's physical impairments, the ALJ discussed imaging of the right knee that revealed moderate tricompartmental osteoarthritic changes with no acute fracture or dislocation, imaging of the lumbar spine that showed mild multilevel generative changes and no acute osseous abnormality, and an MRI of the lumbar spine that showed mild degenerative disc disease at L4-5, moderate left foraminal narrowing, and moderate facet arthropathy on the left at L3-4. (Tr. 24.) He observed that Ms. Thomas continued reporting right knee pain, low back pain that radiated to the lower extremities, numbness and tingling in the left lower extremity, and pain on palpation at times, but she denied weakness, numbness, and incoordination at others. (*Id.*) He observed that some physical examinations noted positive findings, including reduced strength and range of motion, but that other exams noted that Ms. Thomas displayed full strength and range of motion, as well as intact sensation, normal reflexes, bulk, and tone, negative straight leg raise test, and the ability to walk unassisted. (Tr. 24-26.) Regarding gait problems specifically, the ALJ observed that Ms. Thomas reported being unable to walk without an assistive device and that some exams noted antalgic or otherwise abnormal gait, but that she was able to get on and off the exam table without difficulty and was not prescribed or observed to use an assistive device. (*Id.*) He also noted that Ms. Thomas treated her musculoskeletal impairments with over the counter and prescriptive medications, physical therapy, chiropractic care, and large joint injections to the knee, and reported benefit from treatment. (*Id.*) In the context of this discussion of the medical treatment records, the ALJ explained:

> The claimant does have underlying medically determinable musculoskeletal impairments that could reasonably cause some symptoms. However, the pivotal question is not whether such symptoms exist, but whether those symptoms occur with such frequency, duration, or severity as to reduce the claimant's residual functional capacity as set forth above or to preclude all work activity on a continuing and regular basis. <u>In this case, a careful review of the record does not document sufficient objective medical evidence to substantiate the severity of the pain and degree of functional limitations alleged</u>.

(Tr. 24 (emphasis added).)

Regarding Ms. Thomas's mental impairments, the ALJ observed that her mental health records document some positive findings on mental status examination—such as dysphoric, anxious or depressed mood, racing and chaotic thought processes, rapid speech, intense eye contact, grandiose delusions, and impaired attention/concentration—but also document no acute distress, full orientation, concrete and coherent thought processes, appropriate affect, cooperative behavior, and normal mood, speech, perceptions, memory, insight, and judgment with no evidence of preoccupations, delusions, hallucinations, or other unusual thought content. (Tr. 27-28.) He also observed that Ms. Thomas told providers that psychiatric medications improved her symptoms. (Tr. 28.) In the context of this discussion, the ALJ observed:

> The objective evidence does support some mental functional limitations. However, the claimant's allegations, statements, and testimony at the hearing are not supported or consistent with the evidentiary record at the administrative hearing level and do not support any greater mental limitations than those described in the residual functional capacity above.

(Tr. 27 (emphasis added).)

The ALJ also discussed the medical opinion evidence in support of his RFC. (Tr. 29-31.) He found the opinions of the state agency medical consultants consistent with the objective medical evidence at the time of their review but found the evidence and testimony at the hearing level supported a more reduced RFC. (Tr. 29.) He found the opinion of consultative medical examiner Dr. Gatton somewhat persuasive but said Dr. Gatton's failure to provide a function-by-function assessment of physical limitations, his failure to indicate how examination findings would affect Ms. Thomas's functioning in a work setting, and his use of vague, inconclusive terms like "should be able to," "could probably," and "probably could" effectively rendered his assessment "speculative and inconclusive." (*Id.*) As to mental functioning, the ALJ found the opinions of the state agency psychological consultants partially persuasive, declining to include

their "non-vocationally defined terms" in the mental RFC. (Tr. 30.) He also found the opinion of consultative psychological examiner Dr. Tanley partially persuasive, based on his "primarily normal findings" and his use of "non-vocationally defined terms." (*Id.*) The ALJ also considered a letter from LPC Schwartfigure, but noted she is not an acceptable medical source, that she only recently completed a diagnostic intake, and that her letter was a restatement of symptoms rather than an opinion and recited subjective complaints without supporting objective findings; to the extent the letter was an opinion, the ALJ found it not persuasive. (Tr. 30-31.)

After concluding the above discussion, the ALJ explained:

> In summary, while the claimant has medically determinable impairments that could reasonably cause some symptoms and limitations, the above evidence shows that the claimant's testimony regarding the extent of such symptoms and limitations is not fully supported. However, the claimant's complaints have not been completely dismissed, but rather, have been included in the residual functional capacity to the extent that they are consistent with the evidence as a whole. Nevertheless, in considering the criteria enumerated in the Regulations, Rulings, and case law for evaluating the claimant's subjective complaints, the claimant's testimony was not persuasive to establish an inability to perform the range of work assessed herein. The location, duration, frequency, and intensity of the claimant's alleged symptoms, as well as precipitating and aggravating factors are adequately addressed and accommodated in the above residual functional capacity.

(Tr. 31.) As outlined above, it is evident that the ALJ's decision fully addressed the factors set forth in SSR 16-3p and 20 C.F.R. § 404.1529(c)(3), outlined "specific reasons for the weight given to the individual's symptoms," and made findings that were "consistent with and supported by the evidence." SSR 16-3p, 82 Fed. Reg. at 49467.

In challenging the ALJ's subjective symptom analysis, Ms. Thomas asserts that the ALJ "failed to articulate the evidence to support the specific reasons why Plaintiff's allegations were unsupported." (ECF Doc. 8, p. 21.) The undersigned disagrees. As discussed above, the ALJ interwove her conclusions regarding Ms. Thomas's subjective complaints into more detailed

discussions of the treatment records and medical opinion evidence. This analysis adequately explained the weight given to Ms. Thomas's complaints and was supported by specific reasons.

Ms. Thomas also argues "when the ALJ did discuss the evidence, the ALJ cited abnormal objective findings and other evidence consistent with Plaintiff's allegations." (ECF Doc. 8, p. 21.) But the question before this Court is not whether there is evidence to support Ms. Thomas's subjective allegations. Even if there is substantial evidence in the record to support Ms. Thomas's subjective complaints, this Court cannot overturn the ALJ's contrary conclusion "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones*, 336 F.3d at 477. While Ms. Thomas highlights evidence that could support her complaints of greater physical and mental limitations (ECF Doc. 8, pp. 23-25), this Court must respect "'that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts.'" *Blakley*, 581 F.3d at 406 (quoting *Mullen*, 800 F.2d at 545). In this case, Ms. Thomas has not met her burden to show that the ALJ's findings lacked the support of substantial evidence or that the ALJ failed to build an accurate and logical bridge between the evidence and the result.

Given the complete evidentiary record and the ALJ's assessment of that evidence as discussed above, the undersigned finds the ALJ adequately articulated how he assessed Ms. Thomas's subjective complaints and further finds that Ms. Thomas has not met her burden to demonstrate that the ALJ's findings lacked the support of substantial evidence. Accordingly, the undersigned finds the third assignment of error lacks merit.

## V. Recommendation

For the foregoing reasons, the undersigned recommends that the final decision of the Commissioner be **AFFIRMED**.

October 9, 2026

*/s/Amanda M. Knapp*
AMANDA M. KNAPP
United States Magistrate Judge

## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document. Failure to file objections within the specified time may forfeit the right to appeal the District Court's order. *See Berkshire v. Beauvais*, 928 F.3d 520, 530 (6th Cir. 2019); *see also Thomas v. Arn*, 474 U.S. 140 (1985).